# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

RICKY LEE GRUNDY,

    *Petitioner*,

vs.

SHERYL FOSTER, *et al.*,

    *Respondents*.

2:05-cv-00542-PMP-GWF

ORDER

This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits.

## *Background*

### *Challenged Conviction and Claims*

Petitioner Ricky Lee Grundy seeks to set aside his 2000 Nevada state conviction, pursuant to a jury verdict, of second degree kidnapping with the use of a deadly weapon, battery with the use of a deadly weapon, and battery with the intent to commit sexual assault. On direct appeal, the Supreme Court of Nevada reversed two additional convictions for sexual assault with the use of a deadly weapon and sexual assault with the use of a deadly weapon causing substantial bodily harm.

On federal habeas review, Petitioner alleges: (1) in Ground 1, that he was denied due process of law under the Fifth and Fourteenth Amendments when the State knowingly failed to correct alleged perjured testimony by the complaining witness; (2) in Ground 2, that he was

denied his right to confront the witnesses against him under the Sixth and Fourteenth Amendments when the state trial court prevented the defense from further cross-examining the witness on the subject matter in the perjured testimony and when the court excluded a video exhibit offered by the defense that allegedly contradicted the testimony; (3) in Ground 3, that he was denied due process under the Fifth and Fourteenth Amendments when the state trial court instructed the jury that a baseball bat was a dangerous weapon, eliminating the State's burden of proof on the issue; and (4) in Ground 4, that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments when trial counsel failed to object to the jury instruction stating that a baseball bat was a dangerous weapon and when appellate counsel failed to raise the issue on direct appeal.

### *General Factual Background*

The conflicting evidence at trial included the following.  The various relationships between the principal involved parties was a central point of contention at trial.[1]

Brita Weber was the complaining witness.

Weber and Grundy were from Seattle, Washington.  Prior to February 1994, Grundy, Weber, Shandra Bruce, and Jennifer Koaler apparently lived together as what Weber described as "roommates" in Seattle with three children.  Weber testified that the three children were Grundy's son Ricky, Jr., her son Eddy who she testified also was Grundy's son, and Koaler's son Leland.  Weber, Koaler, and Bruce all worked as strippers or "exotic dancers."[2]

In or around February 1994, the group moved to Las Vegas in stages.  Weber testified that Grundy, Bruce, and Koaler went ahead to Las Vegas and that she remained in Seattle with the children.  A couple of weeks later Weber moved down to Las Vegas, and the four

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this case.  No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding of fact by this Court.

[2]#22, Ex. R, at 54-56, 58-59, 61, 94-95 & 97 (Brita Weber); *id.*, Ex. S, at 197-98 (Jennifer Koaler).

1   adults lived in a hotel room.  Weber's son Eddy remained behind with his grandmother, and

2   the other two children apparently also remained behind with someone.  A short time later, the

3   four adults moved into a house in Las Vegas along with the three children.  Weber denied that

4   Eddy remained with his grandmother as a result of a custody battle.[3]

5          Brita Weber testified on direct that she and Grundy "were boyfriend-girlfriend" and that

6   the rest were just "roommates and friends."  She testified that she had known Grundy since

7   she was twelve and that she became his girlfriend when she was approximately eighteen or

8   nineteen.  She maintained that she had been Grundy's girlfriend for over a year in Washington

9   prior to the move to Las Vegas.  She testified that she "had suspected" but did not know at

10  the time that there was a relationship between Grundy and the two other women.  She

11  testified that, in her mind, the only sexual relationship going on was between her and Grundy.

12  She further testified, however, that she "did suspect that there was other stuff going on," *i.e.,*

13  between Grundy and two other women with whom he shared a bedroom according to Weber's

14  testimony described further below.  She testified that this made her feel "[n]ot very good."  On

15  cross-examination, Weber acknowledged that she had "suspected" that Grundy and Shandra

16  Bruce already had started a relationship at the time of the move to Las Vegas and that she

17  was jealous of that relationship.[4]

18         In contrast to Weber's testimony that she and Grundy were boyfriend-girlfriend, Jennifer

19  Koaler testified that Grundy instead had been going with Shandra Bruce "[s]ince right before

20  they moved down to Vegas" in February 1994.  Koaler testified that Weber was very jealous

21  when Grundy and Shandra Bruce got together.  According to Koaler, Weber wanted to be with

22  Grundy, but he did not want to be with her.[5]

23         / / / /

24  _____

25         [3]#22, Ex. R, at 54-59 & 99-100.  In contrast, in Shandra Bruce's testimony, it was not as clear from
     the outset that Weber also would be moving to Las Vegas, and Weber did not come down until after "we
26   bought our house."  *Id.*, Ex. U, at 277-79.

27         [4]#22, Ex. R, at 53-55, 59-60 & 100.

28         [5]#22, Ex. S, at 167-68.

1      Brita Weber testified that she, Grundy, Koaler, and Bruce shared the same upstairs

2  master bedroom in the house in Las Vegas.  She acknowledged on direct, however, that

3  "there was another room downstairs that I kept a lot of stuff at."  She further acknowledged

4  on cross-examination that the downstairs bedroom was considered to be her room, that the

5  room had a separate phone line, that her belongings and a bed were there, and that her own

6  television and stereo were in the room.  She testified that Jennifer Koaler kept her belongings

7  in the master bedroom, and the record does not affirmatively indicate whether Shandra Bruce

8  also kept her belongings in the master bedroom where she indisputably, including by Weber's

9  own account, slept.  On redirect, Weber testified that her bedroom was "eventually moved

10 upstairs" to the master bedroom, at a point prior to the alleged events leading to the

11 prosecution.  She testified that "during those times" she slept in the master bedroom with

12 Grundy, Bruce, and Koaler.[6]

13     In contrast, Jennifer Koaler and Shandra Bruce both testified that, at all times, Grundy

14 and Shandra Bruce had the upstairs master bedroom, Koaler had the other upstairs bedroom,

15 and Brita Weber had her own bedroom downstairs.  Weber stayed upstairs, in Koaler's room,

16 only in November 1996 when Bruce's grandparents stayed in Weber's room while they were

17 visiting.  Multiple guests who stayed at the house at the time and Grundy's son Ricky also

18 testified that the downstairs bedroom was Weber's room.[7]

19     Weber, Koaler, and Bruce danced at the Crazy Horse Too when they first moved to Las

20 Vegas.  Weber testified that Grundy did not work and that all of the household expenses were

21 paid from their dancing income.  Weber acknowledged on cross-examination, however, that

22 Grundy ran an upholstery business when he came to Las Vegas and that he had received a

23 check from his father for approximately $58,000.00 to start the business.  Jennifer Koaler and

24 Shandra Bruce both testified that Grundy was running the upholstery business from the house

25     _____

26     [6]#22, Ex. R, at 59-60, 100-02 & 125-26.

27     [7]#22, Ex. R, at 166-67 (Koaler); #22, Ex. T, at 223-26 (Tenisha Lee); *id.*, at 231-34 & 236 (Ricky
    Grundy, Jr.); *id.*, at 247-48 (Laguan Brown); #22, Ex. U, at 261 (Glenn Bruce); *id.*, at 278-79 & 282 (Shandra
28 Bruce).

1  and was contributing to paying the bills.  Bruce testified that Grundy also was receiving money

2  from leasing the audio equipment from a club that he previously had owned in Spokane,

3  Washington.[8]

4  **October and November 1996**

5  **Brita Weber's Testimony**

6  Weber testified that the problems leading to the incidents in question began in October

7  1996 after the three dancers had left the Crazy Horse Too to start working instead at another

8  club, Club Paradise.  Weber testified that Grundy told her to dance at Club Paradise rather

9  than Crazy Horse Too.  She testified, however, that she did not like Club Paradise and that

10  she wanted to quit.  According to Weber, the problems with Grundy began when he found out

11  that she wanted to quit dancing at the club.[9]

12  Weber explained the reason why she did not like Club Paradise as follows: "I didn't feel

13  comfortable doing it.  I didn't feel I looked as good as the other girls or anything like that."  She

14  stated that she began having arguments with Grundy when he found out that she wanted to

15  quit dancing at the club:

16
17  Q   Did this [wanting to quit] cause any type of arguments in the household?

18  A   Yes.

19  Q   What happened?  Explain that for us.

20  A   It started arguments, but I wanted to quit because
21      I wasn't doing the right things there; that I wasn't
        following the rules that I wasn't being faithful.

22  Q   Who was telling you that you are not being faithful?

23  A   Rick.

24  Q   The defendant?

25  A   Yes.

26  _____

27  [8]#22, Ex. R, at 61-62 & 123-24 (Weber); *id.*, Ex. S, at 193-96 (Koaler); #22, Ex. U, at 276-77 (Bruce).

28  [9]#22, Ex. R, at 62-65 & 99.

1    Q    What does he mean"you are not being faithful"?

2    A    That I am leaving with customers and going back to
3         the club or turning tricks in the club meaning doing
          stuff with customers in the club.

4    Q    And this caused some arguments?

5    A    Yes.

6    #22, Ex. R, at 64-65.

7        Weber testified that the arguments became physical at some point between October

8    16, 1996, and Halloween of that year.  She testified that at some point during this period,

9    Grundy confronted her with a baseball bat in the upstairs master bedroom.  According to

10   Weber, Grundy told her that if he told her the truth nothing would happen to her but that if she

11   lied she would get a beating.  She testified that she told Grundy the truth but he did not believe

12   her.  She testified – perhaps arguably at odds with her statement that she wanted to quit Club

13   Paradise "because I wasn't doing the right things there"  –  that telling the truth meant "[t]hat

14   I didn't do anything and I was faithful to him."[10]

15       Weber testified that Grundy beat her with the baseball bat, hitting her in the head and

16   across her chest, back and stomach.  Weber did not seek medical treatment and "pretty much

17   laid around and tried to keep from – keep it from happening again."  She testified that at some

18   point Grundy took her to a hotel for approximately two days and nights because "he didn't

19   want anybody to know what was going on."  She testified that she was carried to and from the

20   car and that a friend of Grundy drove them to the hotel.  She testified that she was not

21   physically capable of leaving while they were at the hotel and that she was not allowed to

22   leave after she returned to the house.  She testified that she was tied to the bed and that "one

23   of the girls" removed the inside knob on the door to the upstairs bedroom to prevent her from

24   leaving.  Thereafter, there was always someone with her when she was outside the house to

25   make sure that she did not leave Grundy.  #22, Ex. R, at 72-82.

26       / / / /

27   _____

28       [10]#22, Ex. R, at 65 & 69-72.

1    Weber testified that on the night that she returned from the hotel that Grundy beat her

2  again with the baseball bat.  She testified that she "was accused of lying about where the

3  person that gave me drugs was or where he lived."  She testified that she was hit across the

4  stomach with the bat.  She demonstrated the striking action at trial, which the prosecutor

5  described as "like she is holding the bat or horizontally and pushing it down with both hands."[11]

6    Weber testified that the beatings with the baseball bat occurred sometime between

7  October 16, 2008, and Halloween and that the beatings "all happened in October."[12]

8    Weber testified that at some point, Grundy raped her both vaginally and anally with the

9  smaller end of the baseball bat, leaving a cut on her rectum.  She testified that thereafter he

10 forced her to have sex against her will on at least two more occasions, with the last occasion

11 being a couple of days before she left.[13]

12   Weber testified that she sought to get free to get help on November 16, 1996, at a

13 children's Pop Warner football game.  She testified that she left her son with Shandra Bruce's

14 grandparents in the bleachers and went to the cafeteria to seek help.  She testified that she

15 was trying only to get free to obtain medical help but that someone called the police.[14]

16   Weber testified on direct that– as an additional reason only – Grundy also was angry

17 at her during this time concerning drugs.  She acknowledged on cross-examination, however,

18 that she had testified at the preliminary hearing that he had threatened her "not because you

19 were going to quit dancing but because you were on drugs."  Weber initially denied using

20 illegal drugs on cross-examination but then, on further examination, admitted to smoking

21 marijuana, but only "once or twice," and to taking LSD, but only "once."   She further

22 acknowledged that the toxicology screen taken on November 16, 1996, came back positive

23 for cocaine and methamphetamine.   The sexual assault nurse testified that the screen

24 _____

25   [11]#22, Ex. R, at 83-84.

26   [12]Id., at 69 & 119.

27   [13]Id., at 84-90.

28   [14]Id., at 56-69 & 90-92.

1   sometimes produced a false positive.  Weber denied ever having exchanged sex for drugs.[15]

2        Weber further acknowledged on cross-examination that Grundy had broken his hand

3   on or about October 18, 1996, and that he was unable to use or close the hand.[16]

4        Weber acknowledged that she was in a car with Grundy when they were stopped by

5   the police in late October of 1996.  She maintained that she did not ask the police for help at

6   that time because she was scared.[17]

7        Weber acknowledged -- eventually -- that she had gone to a county fair during this time

8   period with the other two women and without Grundy, with thousands of persons present.[18]

9        Weber acknowledged that she went trick or treating with the two other women and the

10   children on Halloween night.[19]

11        Weber acknowledged that Grundy was out of town back in Seattle for a period of time

12   in early November.[20]

13        ***Opposing Defense Evidence and Excluded Defense Evidence***

14        Jennifer Koaler and other defense witnesses told a markedly different version of what

15   occurred in October and November 1996.  The witnesses told a significantly different version

16   of the events, described *infra*, with respect to both the cause of Weber's injuries and her ability

17   to come and go freely.

18        Defense witnesses further described, significantly, a completely different set of

19   relationships in the house in October and November, including the undisputed fact that Ricky

20   Grundy and Shandra Bruce married on October 28, 1996.

21        Jennifer Koaler and Shandra Bruce testified that Brita Weber was invited to the October

22

23   [15]#22, Ex. R, at 72, 83, 96-98, 103, 110 & 123 (Weber); #22, Ex. S, at 145-46 & 150 (Nurse Ebbert).

24   [16]#22, Ex. R, at 119-121.

25   [17]*Id.*, at 114.

26   [18]*Id.*, at 113-14 & 117-18.

27   [19]*Id.*, at 119; see also #22, Ex. S, at 185-86 (Koaler); *id.*, Ex. U, at 285 (Shandra Bruce).

28   [20]#22, Ex. R, at 113.

28 wedding.  Koaler testified that Weber did not go because "[s]he didn't want to accept it" and did not take it well.  Bruce similarly testified that Weber did not show up and instead had "a jealous fit."  When Weber was being cross-examined, she denied knowing back in October 1996 that Grundy and Bruce had married.  Weber acknowledged that she asked Grundy in October 2006 to marry her, after the alleged beating.  When asked whether "it upset you at that time that he didn't want to be with you anymore" she responded "[t]hat's not why I was upset," not directly denying the assertion that she had been rejected.  Weber did directly deny that she had been told that she was going to have to leave the house after Shandra Bruce's grandparents left on November 17, 1996.[21]

With regard to injuries, Julia Bass and Tony Gant testified to an incident on October 5, 1996, in which Brita Weber was struck by another man and fell down some stairs.  Julia Bass knew Grundy and Weber because Grundy coached her son's Pop Warner football team and Weber worked with the cheerleaders.  She also would babysit for Grundy on occasion.  Gant was the corporate security investigator at the Santa Fe Station Hotel and Casino, a locals casino in the northwest part of the Las Vegas valley.  His son also played on Grundy's football team.  Gant remembered the date specifically because his son had a football game that day and he received word only a few days later that his father was dying of cancer.[22]

According to her testimony, Julia Bass was babysitting for Ricky Grundy when she answered a telephone call to the house from Brita Weber.  While testimony regarding the particulars of the call was stopped by a hearsay objection, Weber asked Bass to come pick her up at a Budget Suites, a chain flexible-term apartment facility.  Bass went to the Santa Fe casino to get Grundy.  Gant's shift had just ended, and he was talking to Grundy at the time.  From the casino, Grundy, Bass, and Tony Gant went to the Budget Suites.  #22, Ex. S, at 202-03 (Gant); id., at 215-17 & 221 (Bass).

According to the testimony of Gant and Bass, when they arrived at the Budget Suites,

_____

[21]#22, Ex. R, at 115 & 122 (Weber); id., Ex. S, at 167-68 (Koaler); #22, Ex. U, at 283-84 (Bruce).

[22]#22, Ex. S, at 199-200, 202-03, 206 & 208 (Gant); id., at 212 & 220 (Bass); #22, Ex. T, at 221.

Weber and a white male with a long ponytail were arguing on a landing that was up three flights of stairs.  As they arrived, the male hit, slapped and pushed Weber, causing her to stumble and fall down the stairs.  Gant testified that Weber fell down one flight of stairs and that she stumbled coming down the remaining stairs at least three more times before they were able to get her in the truck.  Bass testified that Weber fell down the three flights, but also in a stop-and-start fashion as she tried to regain her feet each time.  Gant testified that Weber's arms were "flying everywhere" as she tried to break her fall.  Weber appeared to Gant to be "on something because she was just completely out of it" and not from the fall.[23]

Gant and Bass both testified that Weber said that she hurt her wrist and her ribs in the fall.  Gant also testified that she also appeared to have a small bruise on her forehead.  Bass testified that she did not take Weber for medical treatment because Weber said that she did not want to go.  According to Bass, Weber stayed at her house for the next three days, and she wrapped Weber's arm and told her how to reduce the bruising.[24]

Koaler testified that in mid to late October, Weber left the house with a man in a pickup truck.  Weber was tossed from the truck while it was moving, and she returned to the house with her sweat pants ripped up and a cut on her knee.[25]

Koaler, Bruce, and Ricky Grundy, Jr. testified to an incident leading to a physical fight between Koaler and Weber on October 29, 1996.  According to their testimony, collectively, Weber's son Eddy came out of her room with a syringe is in hand, and Ricky Grundy, Jr. took the syringe and showed it to Koaler and Bruce.  Koaler and Weber got into a physical fight over the incident during which Koaler hit Weber with a number of items, including in the head behind her ear with a plaque.  #22, Ex. S, at 178-82 (Koaler); *id.*, Ex. T, at 235-36 (Ricky

---

[23]#22, Ex. S, at 204-10 (Gant); *id.*, at 217-18 (Bass); see also *id.*, Ex. R, at 105-06 & 108-09 (Weber acknowledged calling Julia Bass from the Budget Suites, but she denied being slapped and falling down the stairs); #22, Ex. S, at 186-87 (Koaler testified that she obtained prescription medication for Weber three days after the alleged fall, on October 8, 1996).

[24]#22, Ex. S, at 205 (Gant); *id.*, at 218 (Bass); #22, Ex. T, at 221-22 (same).

[25]#22, Ex.S, at 176-77.

-10-

1  Grundy, Jr.); #22, Ex. U, at 281 (Bruce); see also *id.*, Ex. R, at 110 (Weber testified that she

2  had fought physically with Koaler only once years before October and November 1996).

3       With regard to the alleged sexually-related injuries, Jennifer Koaler testified that she

4  and Brita Weber were having a sexual relationship, including during October and November

5  1996.  She testified that they had sexual relations on November 8, 1996, the day before

6  Shandra Bruce's grandparents were to come visit.  She testified that they were using a dildo

7  that later was described to be twelve inches long and three-and-one-half inches in diameter.

8  Koaler testified that they used the dildo on each other, including anal insertion.  She testified

9  that the sex "[w]asn't always nice and sweet" and that "[y]es, we were rough, you know."

10 There had been rectal bleeding and bruising in the past, and Koaler testified that there was

11 both bleeding and bruising after the November 8 incident.[26]

12       During the cross-examination of Brita Weber, defense counsel sought to inquire into

13 sexual relations between Weber and Koaler, but the inquiry ended on a State objection that

14 was sustained by the trial court:

16  Q    . . . . Now, when you lived in Seattle before you
17       moved to Las Vegas, you and Jennifer had also had
      a relationship, hadn't you?

18  A    No.

19  Q    You and Jennifer were lovers, weren't you?

20  A    No, we were not.

21  Q    If Jennifer comes in here and tells this jury – ?

22       MS. DE LA GARZA: Objection.

23       THE COURT:      Sustained.

24 #22, Ex. R, at 102-03.

25       There had been prior trial court rulings barring this line of cross-examination, and

---

27       [26]#22, Ex. S, at 154 (size reference by counsel); *id.*, at169-72 (Koaler).  Koaler apparently pulled out
   the dildo in question from her bag during her testimony as an impromptu demonstrative exhibit, but the trial
28 judge quickly ordered, upon the State's objection, that it be taken away.  #22, Ex. S, at 170.

-11-

1    defense counsel moved to a question on another topic.[27]

2        The defense later sought to introduce a video of Weber and Koaler engaging in sexual

3    activities with dildos.  The video shows two women using dildos for vaginal penetration, and

4    it appears to be undisputed that the two women were Weber and Koaler.  As described by the

5    Supreme Court of Nevada, "one of the dildos appears to be about twelve inches in length and

6    three and one-half inches in diameter."  The date stamp on the video from the video camera

7    reflected a date of August 6, 1996.[28]

8        The state district court did not permit the defense to introduce the video, as further

9    referenced, *infra*, under Ground 2.

10       Koaler testified that there were no changes to the locks in the doors, that Weber was

11   free to come and go, and that Weber would disappear "for a couple of days here and there."

12   Julia Bass testified that Weber stayed at her home off and on for two weeks in October 1996

13   and also off and on in November.  Multiple other witnesses who either lived at or visited the

14   house similarly testified either that no doorknobs were removed or locks were added and/or

15   that Weber was free to come and go as she chose.[29]

16       Jennifer Koaler, Shandra Bruce, and Ricky Grundy, Jr. testified, collectively, that

17   Petitioner broke his left hand a couple of days before October 18, 1996, showing the boys how

18   to box, and that he went to the doctor on October 18.  They testified that he could not close

19   or use the hand or make a fist and that he had a hard plaster cast on the hand.  #22, Ex. S,

20   at 190-93 (Koaler); *id.*, Ex. T, at 237-38 (Ricky Grundy, Jr.); #22, Ex. U, at 284-85 & 290

21

22       [27]The Supreme Court of Nevada found from a review of the full state court record that "[t]he district
23   court conducted several hearings and bench conferences on the issues involving Weber and Koaler's
     relationship," not all of which had been recorded, and that "it appears from the record that the district court
24   determined that Koaler would be permitted to testify about her relationship with Weber, but that Grundy would
     not be able to question Weber about the relationship." #12, Ex. F, at 4.

25       [28]#40, Ex. 48 (video copied to compact disc); #12, Ex. F, at 3 (Nevada Supreme Court description).
26

27       [29]#22, Ex. S, at 183-85 & 188 (Koaler); *id.*, at 215-16 (Bass); #22, Ex. T, at 234 & 238-39 (Ricky
     Grundy, Jr.); *id.*, at 247-48 (Laguan Brown); #22, Ex. U, at 262-64 (Glenn Bruce); *id.*, at 270-71 (Lois Bruce);
28   *id.*, at 281-82 (Shandra Bruce); see also #22, Ex. R, at 107-08 & 110 (Weber acknowledged staying with
     Bass in October 1996 but only for one night).

-12-

1   (Bruce).

2          Shandra Bruce and Grundy's son Ricky also testified that Grundy was out of town on

3   a trip to Seattle for approximately a week in early November.  Ernest Hall, a Seattle police

4   officer who had known Grundy for about thirty years, since grade school, testified that he saw

5   Grundy in Seattle in early November 1996.[30]

6          Multiple witnesses contradicted Brita Weber's testimony as to having only a sparse

7   involvement with illegal drugs, in connection with the credibility of Weber's trial testimony that

8   Grundy was in a jealous rage rather than angry with her solely due to her alleged drug use.

9          Jennifer Koaler testified that Weber used "speed,"[31] cocaine, and "ecstacy,"[32] with

10  Weber stating to her that the ecstacy helped her at the strip club because "it makes you love

11  everybody."  Julia Bass testified that Weber used cocaine and heroin intravenously.  Bass

12  testified that she had taken Weber to buy drugs, and that she had seen Weber exchange sex

13  for drugs behind a restaurant on H Street twice.[33]  Tony Gant testified that, a few weeks after

14  she fell down the stairs at the Budget Suites, he had to ask Weber to leave the casino after

15  she got into an argument with the same male with the ponytail.  As he approached, Gant

16  observed the man pass Weber "some drugs or something like that," saw her rush to the

17  bathroom, and then observed her to "be out of it" when she came back from the restroom.[34]

18          Sonja Jones also testified regarding Brita Weber's involvement with drugs.  Jones

19  testified that she was the assistant cheerleading coach with Grundy's football team in 1995

20  and was the cheerleader captain in 1996.  She interacted with Weber every day on the field

21  with the cheerleaders.  She testified that Weber offered her drugs on two occasions at the

22

23          [30]#22, Ex. T, at 238-39 (Ricky Grundy, Jr.); *id*., Ex. U, at 291-92 (Bruce); *id*., at 293-95 (Hall).

24          [31]Amphetamines.

25          [32]Pills containing the chemical 3,4-methylenedioxymethamphetamine, also known as "MDMA."

26
27          [33]The area of the "alphabet" streets in Las Vegas has had a history of prevalent crime, including a
    high incidence of drug and prostitution activity.

28          [34]#22, Ex. S, at 173-76 & 186 (Koaler); *id*., at 200-02 & 204 (Gant); *id*., at 212-215 (Bass).

1    practice field, with Jones going "ballistic" the second time in response.[35]

2          Jones further testified to an following exchange with Weber regarding domestic

3    violence:

[A]    We were laughing and joking on the field about
       getting away from people.  I told her about an
       incident that I was trying to get away from my ex-
       husband at the security police department where he
       took – where the post office told me if I had a case
       to make sure it was in public so it wouldn't be my
       word against his word.

       I took off running to the middle of the court and I
       started screaming and yelling that I feel and the
       police officer came out, got me and they arrested
       him.

Q      . . . . Did you discuss that with Brita Weber?

A      We were laughing and talking about it at first and
       then she came back to me and was asking me all
       the details about it.

14   #22, Ex. U, at 253-54.

15         Shandra Bruce also testified that she had observed Weber on or using drugs.  Bruce

16   testified that in early November, after the incident where Weber's son came out of Weber's

17   room with a syringe, she asked Weber to move out effective when Bruce's grandparents visit

18   was over.  Bruce testified that they had been having problems with threatening phone calls

19   and people following them home from work, which Weber attributed to boyfriends.  According

20   to Bruce's testimony, the syringe incident finally made them decide that Weber had to leave.[36]

21   ***Remaining Testimony Pertaining to on and after November 16, 1996***

22         Michael Jensen testified as follows.  On November 16, 1996, he was in the cafeteria

23   at Las Vegas High School holding a photograph fund-raiser for the school's band.  A young

24   woman came in and asked Jensen and the others that he was working with to hide her from

---

26         [35]#22, Ex. U, at 252-55 & 257-58.  The defense further sought to inquire into Weber inviting Jones

27   over for a "fun party," which Jones found out when she arrived would have consisted of her and two other
     women having sex while being videotaped.  The inquiry was halted on a prosecution objection.  *Id.*, at 255-57.

28         [36]#22, Ex. U, at 279-81 & 288-89.

-14-

someone who was after her.  She later said that the person was her boyfriend.  Jensen testified that the woman was physically shaking and very scared.  Jensen took her initially to the student council room, which was behind a locked door to which he had the key.[37]

The woman wanted to call someone in Minnesota to get a plane ticket to leave town, so Jensen and the others took her back to the teachers' lounge where there was a phone. She said that she had been sexually abused and kidnaped and locked in a house.  Jensen and the others recommended that she call the police, but she said that she just wanted to get out of town.  They finally persuaded her to allow them to call the police.[38]

After Jensen went back out to the cafeteria, he saw the woman's alleged boyfriend come in looking for her.  Jensen did not testify to any threatening remarks by the boyfriend. The boyfriend indicated that she was with his Pop Warner group, that she was lost, and that he needed to find her.  Jensen acknowledged on cross-examination that several people from the Pop Warner group were looking for her.[39]

Jensen did not observe any injuries on the woman, who was wearing an Oakland Raiders jacket, but he "found out later that she did have some injuries to her."  She was not crying at first, but she broke down once she felt safe, according to Jensen.[40]

Detective Darlene Falvey with the Las Vegas Metropolitan Police Department ("Metro") testified as follows.  When she arrived at the high school on November 16, 1996, Brita Weber appeared to be in "a lot of pain" and very ill.  Detective Falvey could see "a lot of bruises" that were not covered by clothing.  Weber told her that she had been sexually assaulted.  Although Weber was reluctant to go, Detective Falvey took Weber to University Medical Center for examination.  Falvey observed that Weber's hand was very swollen and that she had large bruises almost all over her body, especially on her chest, buttocks, thigh, and arms.  Her

[37]#22, Ex. R, at 22-25.

[38]*Id.*, at 25-26.

[39]*Id.*, at 26-27 & 28-29.

[40]*Id.*, at 28.

abdomen was hard and distended, suggesting possible internal bleeding.  She additionally had a scab on her knee and a scratch behind her ear.[41]

On cross-examination, Detective Falvey stated that she was an expert in how wounds occur because she had been a nurse for eighteen years before becoming a police officer. She testified that the wounds were not consistent with someone falling down a flight of stairs or falling out of a moving vehicle.  She estimated that the scratch behind Weber's ear had occurred "within the last week or so" prior to November 16, 1996.[42]

The sexual assault nurse examiner, Nurse Linda Ebbert testified as follows.  She had been a registered nurse for thirty-eight years and had been a sexual assault nurse examiner for five years.  She worked in the emergency room three days a week as an emergency room nurse, which was her position when she was not doing sexual assault examinations.[43]

Nurse Ebbert testified that Brita Weber had fractures to the ulna, which is the bone of the two forearm bones that is on the "little finger" side of the forearm, and to the fifth metacarpal bone of the hand, which is the last long bone of the hand (*i.e.*, the five long bones underlying the palm of the hand) also at the "little finger" side of the hand.  Weber's abdomen was hard and tender to palpation.  Weber had a laceration of the liver, and she had broken ribs on the right side over the area of the liver.  Weber had multiple bruises over her body, including to the inside area of the elbow, the left upper arm, the left shoulder, the chest, the left thigh, and both sides of her buttocks.  Her hands were bruised and swollen.  She additionally had healing abrasions on her right knee, left upper arm, and right elbow as well as a small superficial laceration behind her right ear.  Finally, Weber had bruising between the vagina and rectum with a fairly deep rectal laceration, with bruising, at the "6 o'clock" position, *i.e.*, at the bottommost position with the patient on her back. #22, Ex. S, at 135-45.       No needle marks were evident on Nurse Ebbert's examination.  As previously discussed, the

---

[41]#22, Ex. R, at 32-41.

[42]*Id.*, at 41-43.

[43]#22, Ex. S, at 131-33.

preliminary drug screen was positive for cocaine and methamphetamine, but the nurse testified that false positives were possible with the test.  She was not aware of the results of any followup testing performed.[44]

Nurse Ebbert testified that the bruising and other nonsexual injuries sustained were consistent with Brita Weber's account of being beaten with a baseball bat.  She testified on direct that she found the injuries "more consistent" with Weber's account than with falling down stairs "especially with the hands and the arm they are clearly defensive, self-defense injuries."  On cross-examination, she testified that she "definitely fe[lt] that the injuries to her arms and her hands were self-defense injuries."  She testified that when one falls down stairs the person "usually" has wrist injuries rather than hand injuries and that she had not seen a patient who had fallen down stairs with metacarpal and ulnar fractures.  She acknowledged that she had seen a person from a fall that had bruising all over their body.[45]

Nurse Ebbert testified that the rectal tear and bruising were consistent with Weber's account that she had been sexually assaulted in her rectum with a bat.  Subsequent sexual activity would aggravate the injury and cause renewed tearing and bleeding.  Nurse Ebbert testified that the rectal injuries involved were not consistent with the use of a sex toy.  When pressed further on cross-examination as to a twelve-inch long and three-and-a-half inch diameter dildo, she initially stated that she "would not expect" such injuries.  On further questioning, she acknowledged that the location of injury would depend upon the patient's position when a dildo of that size were used.  She testified again, however, that she "would not expect" the injuries to be caused by a dildo, in that she had "never seen a dildo cause that kind of injury."[46]

/ / / /

As the Supreme Court of Nevada found in reviewing the trial transcript, Nurse Ebbert

_____

[44]#22, Ex. S, at 144-46, 150 & 153.

[45]*Id.*, at 146-47 & 148-49.

[46]*Id.*, at 140-41 & 154-55.

-17-

1   "could not . . . rule out the possibility that a dildo inserted into the rectum without lubricants

2   could cause the type of rectal injuries she observed."  The state high court further observed

3   that, while the medical records were introduced, "the State did not call a physician to give an

4   opinion regarding the age or source of the injuries."[47]  The State, in particular, did not present

5   any expert testimony regarding the probable age of the bruising and other injuries observed

6   on November 16, 1996.  Nor did the State present any forensic medical testimony by a

7   physician as to the causation of the injuries that was based upon a broad body of cases

8   studies extending beyond what one emergency room nurse may or may not have observed

9   solely in her own personal clinical experience.  Nurse Ebbert's opinions, in contrast, were

10  based solely upon her own clinical experience and the history provided by Weber.

11         As of the time of trial, Brita Weber testified that she was living in another state and that

12  she had been a pre-school teacher for "about a month and a half."[48]

13  **Defense Closing Argument**

14         In the defense closing argument, counsel maintained that Brita Weber was angry at

15  Grundy because he married Shandra Bruce instead of her and because she had been told to

16  leave after the syringe incident with her son.  Counsel argued that Weber lied about the cause

17  of her injuries so that she would be able to take her son with her when she was forced to leave

18  the house.  Counsel characterized the case as in truth a child custody case rather than a rape

19  and kidnaping case.  He further pointed to Grundy's inability to use both of his hands together

20  after mid October, to the alternate causes for Weber's injuries, including the sex with Jennifer

21  Koaler, to the multiple witnesses contradicting Weber's account of being held hostage, and

22  to the undisputed times during which Grundy was away and/or Weber was outside the house

23  without Grundy. #22, Ex. V, at 316-24.

24         / / / /

25  **Verdict and Subsequent Proceedings**

26  _____

27         [47]#12, Ex. F, at 9.

28         [48]#22, Ex. R, at 52-53.

1    The jury found Grundy guilty of second degree kidnapping with the use of a deadly

2    weapon, battery with the use of a deadly weapon, battery with the intent to commit sexual

3    assault, sexual assault with the use of a deadly weapon and sexual assault with the use of a

4    deadly weapon causing substantial bodily harm.  The Supreme Court of Nevada reversed the

5    conviction on the last two charges on direct appeal, as discussed more fully, *infra*, under

6    Ground 2.

7    Additional factual and procedural background pertinent to the individual claims

8    presented is set forth below in the discussion of the respective claims.

9    ***Governing Law***

10   The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

11   deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333

12   n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of

13   review, a federal court may not grant habeas relief merely on the basis that a state court

14   decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.

15   2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if

16   the decision: (1) was either contrary to or involved an unreasonable application of clearly

17   established federal law as determined by the United States Supreme Court; or (2) was based

18   on an unreasonable determination of the facts in light of the evidence presented in the state

19   court.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

20   A state court decision is "contrary to" law clearly established by the Supreme Court only

21   if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

22   if the decision confronts a set of facts that are materially indistinguishable from a Supreme

23   Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

24   124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely

25   because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

26   held that a state court need not even be aware of its precedents, so long as neither the

27   reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

28   not overrule a state court for simply holding a view different from its own, when the precedent

-19-

from [the Supreme] Court is, at best, ambiguous." *Mitchell*, 540 U.S. at 17, 124 S.Ct. at 11. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18,124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

To the extent that the state court's factual findings are challenged intrinsically based upon evidence in the state court record, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, the AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972. If the state court factual findings withstand intrinsic review under this deferential standard, they then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may be overturned based on new evidence offered for the first time in federal court, if other procedural prerequisites are met, only on clear and convincing proof. 393 F.3d at 972.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Davis*, 333 F.3d at 991.

////

////

***Discussion***

-20-

**Ground 1:  Failure to Correct Alleged Perjured Testimony**

In Ground 1, Petitioner alleges that he was denied due process of law under the Fifth and Fourteenth Amendments when the State knowingly failed to correct alleged perjured testimony by Brita Weber denying having a sexual relationship with Jennifer Koaler.

On direct appeal, the Supreme Court of Nevada stated only as follows with regard to the claim corresponding to federal Ground 1:

> Grundy raised . . . additional issues[, *inter alia*,]: . . . that the State and district court knowingly permitted perjured testimony . . . .  We have considered these contentions and conclude that they are without merit.

#12, Ex. F, at 13 n.31.  The extensive discussion by the state supreme court in the remainder of its order concerning sex, lies, and videotape pertained directly to the confrontation claim presented in federal Ground 2, not to the claim in federal Ground 1.  While some of the state high court's discussion as to Ground 2 may have some indirect relevance as to Ground 1, the state court's holding as to federal Ground 1 is set forth above in its entirety.

As noted previously, a state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court precedent. *E.g., Mitchell,* 540 U.S. at 15-16, 124 S.Ct. at 10.  Where, however, the state court reaches a decision on the merits but does not supply a reasoned basis for its decision, the federal court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  *E.g., Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  This Court accordingly conducts an independent review of the state court record under the deferential AEDPA standard of review to determine whether the result reached by the state high court constituted an unreasonable application of clearly established federal law.

Under clearly established federal law, including the Supreme Court decisions in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), a defendant is denied due process of law if his conviction is obtained through the use of material evidence that state representatives

-21-

knew or should have known was false.[49]  The same result obtains even where the State, although not itself soliciting the false testimony, allows it to stand uncorrected when it appears.[50]  The prosecution's duty to correct perjury by its witnesses is not discharged merely because defense counsel also knew or should have known of the perjury or because the jury perhaps might be able to figure out from other evidence that the witness lied.[51]  Rather, when the prosecution knows or should know that the witness has lied, it has a constitutional duty to correct the false impression of the facts.[52]  And this duty extends to information not known by the individual prosecutor trying the case where the information is known to other State representatives.[53]  Moreover, the principle that the State may not knowingly use false testimony "does not cease to apply merely because the false testimony goes to the credibility of the witness;"[54] and impeachment evidence is not necessarily rendered immaterial by the availability of other grounds for attacking the witness' credibility.[55]  Reversal is required unless the perjured testimony is harmless beyond a reasonable doubt, *i.e.,* the conviction must be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."[56]

/ / / /

In the present case, the Nevada Supreme Court's rejection of Petitioner's claim in

---

[49]*Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *Thomas v. Cardwell*, 626 F.2d 1375, 1381 (9th Cir. 1980).

[50]*Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *United States v. LaPage*, 231 F.3d 488, 491 (9th Cir. 2000).

[51]*See,eg., LaPage*, 231 F.3d at 491-92; *see also Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003)("Whether defense counsel is aware of the falsity of the statement is beside the point.").

[52]*Id.*

[53]*See Giglio*, *supra*; *Thomas*, 626 F.2d at 1381.

[54]*Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *LaPage*, 231 F.3d at 491.

[55]*See Napue*, 360 U.S. at 270, 79 S.Ct. at 1177; *see also Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002).

[56]*See Napue*, 360 U.S. at 271, 79 S.Ct. at 1178; *LaPage*, 231 F.3d at 491.

1   federal Ground 1 was neither contrary to nor an objectively unreasonable application of this

2   clearly established federal law.  At bottom, the trial transcript does not establish that Brita

3   Weber committed perjury during the limited cross-examination allowed by the state trial court.

4   The limited cross-examination allowed was initiated by a question directed to the time frame

5   "when you lived in Seattle before you moved to Las Vegas," *i.e.*, prior to in or around February

6   1994.  The video in question instead carries an August 6, 1996, date stamp, approximately

7   two-and-a-half years after the time frame inquired into on cross-examination.  Absent a

8   foundation question directing the inquiry to a time frame that included the stated time of the

9   video in August 1996, the record does not establish that the answers given by Weber

10  constituted perjury.[57]  Such a foundation question quite likely would have followed if the trial

11  court had permitted further inquiry, but that circumstance pertains to an issue of confrontation,

12  addressed *infra*, not to one of knowing use of perjured testimony.  Absent proof that Weber

13  committed perjury in responding to the line of questioning that was actually asked, the Nevada

14  Supreme Court's terse rejection of this claim was neither contrary to nor an unreasonable

15  application of the clearly established federal law in *Napue* and *Giglio*.

16       Ground 1 therefore does not provide a basis for federal habeas relief.

17       Following upon a number of the arguments raised by the Respondents, the Court

18  emphasizes what it does *not* hold on Ground 1 before proceeding to Ground 2, so that it will

19  clear that its holding on Ground 1 does not rest upon a improper legal premise.

20       First, the Court is not persuaded by the Respondents' suggestion that it is "of particular

21  note" that it was defense counsel rather than the State that elicited the testimony. #43, at 7,

22  lines 23-24.  It is clearly established law that a due process violation occurs even where the

---

23

24       [57]The Court is cognizant that the second question, in isolation, asks: "You and Jennifer were lovers,

25  weren't you?"  However, the only foundation question putting that second question into context is the one
    foundation question immediately before it that directs the time frame to the time before Weber and Koaler

26  moved to Las Vegas, which is over two years prior to the August 1996 date stamp in the video.

27       Moreover, the mere fact that Koaler may have testified contrary to Weber's testimony -- without the
    corroboration of the video directed to a specific time frame actually addressed in Weber's testimony – of

28  course does not establish that Weber was testifying falsely on the specific questions that she was asked.

State, although not itself soliciting the false testimony, allows it to stand uncorrected when it appears.[58]

Second, the Court is not persuaded by the Respondents' argument that the statements were not "material" under *Napue* because the sexual activity pertained only to the reversed sexual assault charges and not to the remaining charges. #43, at 9, lines 16-19.  It is clearly established law that evidence that goes only to the credibility of the witness is material.[59]  A lie by Brita Weber regarding sexual activity with Jennifer Koaler that then was directly contradicted by the video would have substantially impaired her credibility as to all of her testimony, on all charges.  If Weber in fact unquestionably had lied in the limited cross-examination that the trial court allowed, there is no question but that the perjured testimony would have been material under *Napue* and *Giglio*.

Third, the Court is not persuaded by the Respondents' argument that "the false testimony was not material in terms of overall credibility" because defense counsel cross-examined Weber about the sexual relationship and Koaler testified at length concerning the sexual relationship. #43, at 9, lines 20-27.  At the outset, a substantial flaw in this argument is that the trial court did not allow defense counsel to cross-examine Weber to any significant degree regarding the sexual relationship.  In all events, it is clearly established law that impeachment evidence is not necessarily rendered immaterial by the availability of other grounds for attacking the witness' credibility.[60]  Without question, if Weber had lied about sexual activity with Koaler, such perjured testimony would not have been rendered harmless beyond a reasonable doubt merely because the defense was able to introduce contrary testimony from Koaler.  The question of whether it was Weber or instead Koaler who was lying as to what was going on in the household was *the* central issue to the entire case; it was upon

---

[58]*Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *LaPage*, 231 F.3d at 491.

[59]*Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *LaPage*, 231 F.3d at 491.

[60]*See Napue*, 360 U.S. at 270, 79 S.Ct. at 1177; *see also Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002).

1   this question of credibility that guilt or innocence literally hung in the balance.   Allowing

2   perjured testimony to stand regarding sexual activity between the two that was directly belied

3   by the video indisputably would not have been harmless beyond a reasonable doubt.

4          Fourth, the Court is not persuaded by the Respondents' assertion that the Supreme

5   Court of Nevada "specifically found that Weber did not deny having sexual activity with

6   Koaler." #43, at 8, lines 22-23.   What the state supreme court found was that "the record does

7   not substantiate a finding that Weber was denying *any* sexual activity with Koaler." #12, Ex.

8   F, at 8 (emphasis added).   The Court reads this statement as signifying that – due to the fact

9   that further cross-examination was prohibited by the trial court – Weber's abbreviated

10   testimony on the point did not constitute an unequivocal denial of any and all sexual activity

11   with Koaler at any and all times.   In this regard, the state high court discussed at length what

12   the court thought that Weber might or might not have testified to regarding sexual activity with

13   Koaler if the cross-examination had been allowed to continue.   *Id.*, at 10.   This Court further

14   is not sanguine that asking a woman whether she and another woman were lovers reasonably

15   has any other meaning than with regard to whether the women were engaged in a sexual

16   relationship.   Outside the context of a politician seeking to draw strained distinctions between

17   the possible meaning of words to forestall a developing scandal, the question asked of Weber

18   at trial has and had a clear and immediately apparent meaning.

19          Fourth, in this same vein, this Court does not base its holding on Ground 1 on the

20   Nevada Supreme Court's distinction – in its holding on Ground 2 – between "vaginal foreplay"

21   and a woman engaging in sexual activities with another woman. #12, Ex. F, at 5.n.5.   This

22   Court would not profess to define at what specific point a woman no longer can honestly

23   proclaim: "I did not have sex with that woman."   The Court is not sanguine, however, after

24   viewing the video in question, that the Nevada Supreme Court's effort to distinguish between

25   "vaginal foreplay" and sexual activity by a woman with another woman resulted in a distinction

26   with a difference.   The question does arise as to at what point the state supreme court would

27   find that two women were engaging in sex rather than "foreplay," given the context of sex

28   between two women.   This Court makes no effort to parse between gradations of sexual

1    activity between women in its holding on this claim.

2         Finally, given that the testimony in the final analysis was not shown to be untruthful with

3    the limited foundation laid, the Court makes no holding that Petitioner would not have been

4    able to establish that the State either knew or should have known that an unqualified denial

5    of sexual activity was untruthful.  *Cf.* #43, at 9, lines 10-15.  *If* Weber *had* lied in a manner

6    directly refuted by the video, the State would not have been able under *Napue* and *Giglio* to

7    stand silently by and allow such perjury by its key witness to stand uncorrected.

8         The Court expressly rejects each and every one of the foregoing points as a basis for

9    a decision denying relief on Ground 1.  This Court's decision denying relief on this ground

10   instead is based exclusively upon the fact that the trial transcript does not establish that the

11   witness committed perjury because the video is from a time later than the time frame inquired

12   about on the limited cross-examination allowed.  While the trial court's limitation on the cross-

13   examination is another issue, the transcript does not establish perjury based upon the limited

14   questioning allowed.

15        Accordingly, the Court does not grant relief based upon Ground 1.

16   **Ground 2:  Confrontation Clause Violation**

17        In Ground 2, Petitioner alleges that his right to confront the witnesses against him

18   guaranteed by the Confrontation Clause of the Sixth Amendment through the Fourteenth

19   Amendment was violated when the state trial court excluded the video showing sexual activity

20   between Brita Weber and Jennifer Koaler and prevented the defense from cross-examining

21   Weber regarding sexual activity with Koaler.

22        This Court reaches only the Confrontation Clause claim based upon the trial court

23   prohibition of cross-examination of Brita Weber regarding her sexual activities with Jennifer

24   Koaler.  The Nevada Supreme Court's rejection of this claim on the basis of harmless error

25   was, at the very least, an objectively unreasonable application of clearly established federal

26   law as determined by the United States Supreme Court.

27        / / / /

28        The Ninth Circuit's post-AEDPA decision in *Fowler v. Sacramento County Sheriff's*

-26-

*Department*, 421 F.3d 1027 (9th Cir. 2005), summarizes the governing Supreme Court law

concerning the right to cross-examination guaranteed by the Confrontation Clause:

> The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. This right, which is incorporated by the Fourteenth Amendment so as to apply to state prosecutions, *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), "guarantees the defendant [not only] a face-to-face meeting with witnesses appearing before the trier of fact," *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), but also the right to cross-examine those witnesses. *Pointer*, 380 U.S. at 404, 406-07, 85 S.Ct. 1065; *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)("[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination...."). Thus, as is relevant here, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *See Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)); *see also Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988)(per curiam) (quoting *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431).

> . . . . .

> . . . two points warrant emphasis.

> *First*, "the right to cross-examine includes the opportunity to show [not only] that a witness is biased, [but also] that the testimony is exaggerated or [otherwise] unbelievable." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (plurality); *see also Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."); *Davis*, 415 U.S. at 316, 94 S.Ct. 1105 ("[T]he cross-examiner is ... permitted to delve into the witness' story to test the witness' perceptions and memory, [and] ... has traditionally been allowed to impeach, *i.e.*, discredit, the witness."). Thus, cross-examination may implicate the Sixth Amendment without implying conscious or malicious fabrication on the part of the witness so long as it otherwise bears on the witness's reliability or credibility. *See Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431. For example, in *Davis*, the defendant sought to cross-examine a prosecution witness regarding the fact

that, at the time he identified the defendant to the police, he was on probation after having been adjudicated a juvenile delinquent. *Davis*, 415 U.S. at 309-11, 94 S.Ct. 1105.  In so doing, the defense sought to show not that the prosecution witness consciously or maliciously lied, but that he might have made a "hasty and faulty identification" of the defendant to shift suspicion away from himself, or that he might have been subject to "undue pressure" from the police resulting from fear of possible probation revocation. *Id.* at 311, 317-18, 94 S.Ct. 1105.  The Supreme Court held that the precluded cross-examination came within the ambit of the Sixth Amendment. *Id.* at 317-18, 94 S.Ct. 1105.

*Second*, cross-examination may implicate the Sixth Amendment even if it is not certain to affect the jury's assessment of the witness's reliability or credibility.  *See Davis*, 415 U.S. at 317, 94 S.Ct. 1105(refusing to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted th[e] [defendant's] line of reasoning had counsel been permitted to fully present it," but nevertheless concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination by precluding the proffered cross-examination). Rather, it is sufficient that a jury "might reasonably" have questioned the witness's reliability or credibility in light of the cross-examination. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431; *see also Olden*, 488 U.S. at 232, 109 S.Ct. 480 (1988) (*quoting Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431); *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431 (holding that the defendant "state[d] a violation of the Confrontation Clause" where "[a] reasonable jury might have received a significantly different impression of [the prosecution witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination"); *Davis*, 415 U.S. at 319, 94 S.Ct. 1105 (concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination where "[s]erious damage to the strength of the State's case would have been a real possibility had [the defendant] been allowed to pursue [the proffered] line of inquiry").

421 F.3d at 1035-36 (italics in original).[61]

In this case, the Nevada Supreme Court first held, after canvassing Confrontation Clause precedent, that the trial court's exclusion of the video was not error.  The court reached a different conclusion, however, regarding the limitation on cross-examination:

---

[61]The Supreme Court of Nevada did not make a holding that no confrontation error occurred.  The state high court instead held that the trial court erred in prohibiting the cross-examination and then proceeded to a harmless error analysis intended "to protect a criminal defendant's constitutional rights." #12, Ex. F, at 9.  This Court has no difficulty in concluding that the trial court's prohibition on cross-examination violated the Confrontation Clause under the foregoing standards.

> The same cannot be said [as to absence of error], however, about the district court's decision to prohibit Weber from being cross-examined regarding her sexual activities with Koaler. Because Weber's sexual activities with Koaler were a material part of Grundy's theory of defense, examination into those activities is not protected by NRS 50.090 [Nevada's rape shield statute] and the district court erred in prohibiting cross-examination on this issue. . . . .

#12, Ex. F, at 8.

The state high court then turned to the question of "whether that error warrants a reversal of any or all of Grundy's convictions." The court stated the test that it applied on this issue as follows:

> In order for an error to be reversible, it must be prejudicial and not merely harmless.[FN12] The test, therefore, is "whether . . . the verdict would have been the same in the absence of the error."[FN13] This court has concluded that, in order to protect a criminal defendant's constitutional rights, "guilty verdicts must be free from doubt."[FN14]

> [FN12] <u>Ross v. State</u>, 106 Nev. 924, 928, 803 P.2d 1104, 1106 (1990) (citing <u>Garner v. State</u>, 78 Nev. 366, 374, 374 P.2d 525, 530 (1962)).

> [FN13] <u>Id.</u> (quoting <u>Witherow v. State</u>, 104 Nev. 721, 724, 765 P.2d 1153, 1156 (1988)).

> [FN14] <u>Id.</u> (citing <u>Flanagan v. State</u>, 104 Nev. 105, 107, 754 P.2d 836, 837 (1988) and <u>Yates v. State</u>, 103 Nev. 200, 206, 734 P.2d 1252, 1256 (1987)).

#12, Ex. F, at 8-9.

Applying the above test of harmless error, the Supreme Court of Nevada concluded that the error was not harmless regarding the convictions for sexual assault with a deadly weapon and sexual assault with a deadly weapon causing substantial bodily harm:

> . . . . Had Grundy been permitted to cross-examine Weber about her sex acts with Koaler, Weber might have admitted to using a dildo with Koaler. If Weber denied ever using the dildo, Grundy would be able to argue for the admission of impeachment evidence showing Weber using the dildo, but in a format less prejudicial than the videotape. Because these counts allegedly occurred at the same time, we cannot conclude that the verdict on the anal and sexual assault charges would have been the same if Grundy had been able to question Weber about her relationship with Koaler. We therefore conclude that Grundy's conviction for sexual assault with a deadly weapon and sexual assault with a

1

deadly weapon causing substantial bodily harm must be reversed

. . . .

2

#12, Ex. F, at 10.

3

4          The state supreme court, however, applying the same harmless error standard,

5   concluded that the error was harmless regarding the remaining convictions:

6                  As to the kidnapping, battery with use of a deadly weapon,
            and battery with intent to commit sexual assault, we conclude that
7           the results of the trial would not have been different if Grundy had
            been allowed to question Weber about her sexual activities with
8           Koaler.  Testimony regarding the sexual relationship has no
            bearing on the cause of the significant injuries to Weber's liver, rib
9           and wrist.  Moreover, while Weber's credibility was at issue, we
            cannot conclude that a more extensive cross-examination about
10          Koaler would have resulted in the admission of impeachment
            evidence affecting her credibility.  Weber might simply have
11          admitted to the sexual activity portrayed in the videotape, but
            denied using a dildo in anal sex.  Finally, these counts were
12          distinct in time from the incidents involving the use of a baseball
            bat anally and vaginally.  With the exception of the additional
13          cross-examination of Weber, the jury heard all of Grundy's
            evidence regarding alternate explanations for Weber's injuries
14          and her motive for allegedly making false accusations against him
            on these counts.  They rejected this evidence, and we conclude
15          that the additional cross-examination regarding sexual activities
            with Koaler would not have changed the verdict.

16

#12, Ex. F, at 9-10.

17

18          At the outset, the Nevada Supreme Court's decision was contrary to clearly established

19   federal law because the state high court applied a harmless error rule that contradicts the

20   standards in the governing law set forth in Supreme Court case law.

21          The *Chapman* harmless error standard applies to a Confrontation Clause violation

22   when the unconstitutional restriction on cross-examination is addressed on direct review.  *See*

23   *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.  Under this standard, "before a federal

24   constitutional error can be held harmless, the court must be able to declare a belief that it was

25   harmless beyond a reasonable doubt."  *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824,

26   828, 17 L.Ed.2d 705 (1967).  That is, the standard requires "the beneficiary of a constitutional

27   error to prove beyond a reasonable doubt that the error complained of did not contribute to

28   the verdict obtained.  *Id.*

-30-

In contrast, the Supreme Court of Nevada applied a harmless error standard that in truth was nothing more than a simple "but for" causation standard.  The state supreme court simply inquired as to whether "the verdict would have been the same in the absence of the error," based upon the court's speculation as to what might have happened on cross-examination.  The *Chapman* Court stated that there was "little, if any, difference" between the harmless error standard announced in *Chapman* and the harmless error standard applied in a prior case that inquired as to "whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction."  386 U.S. at 24, 87 S.Ct. at 828.  The simple "but for" causation standard applied by the Supreme Court of Nevada most certainly was different – in substance – from a standard looking instead to whether there was a reasonable *possibility* that the error *might* have contributed to the conviction.  The watered-down standard applied by the state supreme court most certainly did not require the State to establish *beyond a reasonable doubt* that the error did not contribute to the verdict.[62]

---

[62]In its order in this case, the Supreme Court of Nevada cited to its decision in *Ross* quoting its decision in *Witherow* as the source for the proposition that "[t]he test, therefore, is "whether . . . the verdict would have been the same in the absence of the error."

In *Witherow*, the state high court held as follows:

> Having concluded that improper arguments were made, it must next be determined whether the errors were harmless beyond a reasonable doubt. *Manning* [*v. Warden*], 99 Nev. [82] at 87, 659 P.2d [847]at 850 [(1983)]; *see also Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Appellant was charged with a serious felony. The evidence against him was substantial enough to convict him in an otherwise fair trial. *However, it cannot be said without reservation that the verdict would have been the same in the absence of error.*  Together the errors had the effect of undermining appellant's defense. Thus, the cumulative effect of the errors denied appellant his right to a fair trial. Therefore, appellant's conviction must be reversed.

104 Nev. at 724-25, 765 P.2d at 1155-56 (emphasis added).

By the time of *Ross*, the statement emphasized above in *Witherow* became the following test of harmless error: "The test is whether "without reservation . . . the verdict would have been the same in the absence of error."  106 Nev. at 928, 803 P.2d at 1106.

By the time of the decision in this case, the "without reservation" qualifier was dropped, and the

(continued...)

-31-

This Court accordingly holds that the Nevada Supreme Court's decision rejecting this claim was contrary to clearly established federal law as determined by the United States Supreme Court.

This Court further holds, in the alternative, that the Nevada Supreme Court's harmless error analysis in this case constituted an objectively unreasonable application of the United States Supreme Court harmless error precedent in *Chapman* and *Van Arsdall*. In the latter case, the Supreme Court delineated the analysis appropriate to the particular context of an unconstitutional restriction on cross-examination:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . .

*Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

The Supreme Court of Nevada did not assume in this case that the damaging potential of the cross-examination were fully realized. The state high court instead assumed that the cross-examination potentially might not have resulted in the admission of impeachment evidence affecting the key State witness' credibility because "Weber might simply have admitted to the sexual activity portrayed in the videotape, but denied using a dildo in anal sex." Such speculative minimizing of the damaging potential of the cross-examination is directly

---

[62](...continued)
harmless error standard was stated simply as a "but for" causation standard of whether the verdict would have been the same in the absence of the error.

In all events, regardless of the genesis and evolution of the standard applied in this case, the simple causation standard applied by the Supreme Court of Nevada in this case was not the *Chapman* harmless error standard. While the language applied in this case originated in a Nevada state case applying the *Chapman* standard, the language – which first was taken out of context, then was modified, and likely was not intended originally to state a governing standard – clearly was not the same as the *Chapman* standard.

contrary to the required analysis under which the reviewing court instead must assume "that the damaging potential of the cross-examination were fully realized."

If, on the one hand, Weber ultimately had conceded on a rigorous continued cross-examination that she engaged in sexual activity with Jennifer Koaler after they moved to Las Vegas, including rough anal sex, her testimony would have bolstered the credibility of Koaler's testimony. Such a concession on cross would have bolstered Koaler's testimony not only directly as to the potential alternate cause of the sexual injuries but also indirectly on all of the multiple points where the witnesses contradicted each other. These points of contradiction extended to key testimony regarding the relationships in the house that were central to the case and that pertained directly to the State's theory of causation on the remaining injuries.

If, on the other hand, Weber had denied any and all sexual activity with Koaler at any time, including in Las Vegas in August 1996, the ensuing impeachment likely would have been devastating to the credibility of the State's key witness. In this regard, the Court is not sanguine that the video could have been constitutionally excluded if Weber had unqualifiedly lied on the stand about engaging in the sexual activities recorded on the video.[63] However, even if, *arguendo*, the video itself constitutionally could be excluded, the State nonetheless would have been required, under *Napue* and *Giglio*, to stand before the jury and inform the jurors that the State's key witness had committed perjury and that Koaler instead was telling the truth on a material matter. The impact of such a concession by the State on the verdict, as to all charges, cannot be underestimated or minimized away by assuming that something less damaging instead may have occurred as a result of the cross-examination.

With regard to the *Van Arsdall* factors, Brita Weber of course was not merely an important witness, she was the State's key witness. As noted under Ground 1, the question

---

[63]The Court makes no definitive holding in this regard as it does not reach the issue of whether Petitioner's confrontation rights were violated by the exclusion of the videotape. The Court's holding with regard to the cross-examination violation is the same without regard to whether the video could have been constitutionally excluded. This Court would be hard-pressed to conclude, however, that a state court holding that the Constitution did not require that the video be admitted in the circumstance of an unqualified lie by Weber would be neither contrary to nor an unreasonable application of clearly established federal law.

1   of whether it was Weber or instead Koaler who was lying as to what was going on in the

2   household was *the* central issue to the entire case; it was upon this question of credibility that

3   guilt or innocence literally hung in the balance.  Weber's testimony as to the circumstances

4   of how her injuries occurred was not merely cumulative, it was the only testimony as to these

5   factual circumstances.  The medical evidence presented was consistent with Weber's

6   account, but the limited expert medical evidence presented by the State hardly conclusively

7   ruled out any possibility that Koaler and the other defense witnesses instead were telling the

8   truth as to the injuries.  The overall strength of the State's case thus remained contingent upon

9   the credibility of its key witness, Brita Weber.  The remaining cross-examination that was

10  allowed did not overcome the trial court's error in limiting cross-examination on this issue.

11          In light of the foregoing, the Nevada Supreme Court's decision, which viewed the cross-

12  examination as potentially impacting Weber's credibility only on the sexual assault charges

13  rather than on all of the charges, was an objectively unreasonable application of clearly

14  established federal law.

15          If a federal court concludes on habeas review that a state court's harmless error

16  holding is contrary to or an unreasonable application of clearly established federal law, no

17  deference is owed under the AEDPA.  *E.g., Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th

18  Cir. 2005).  The court then conducts an independent harmless error review under the standard

19  in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).  *Id.*  Under

20  *Brecht*, a petitioner is entitled to relief if "'the error had a substantial and injurious effect or

21  influence in determining the jury's verdict.'" Substantially for the reasons assigned above, the

22  Court concludes that the Sixth Amendment violation in this case was not harmless under the

23  *Brecht* standard.  *Accord Fowler*, 421 F.3d at 1041-43 (applying *Van Arsdall* factors in

24  determining whether the confrontation error was harmless under the *Brecht* standard).

25          The Court accordingly concludes that Petitioner is entitled to federal habeas relief on

26  the claim in Ground 2 that he was denied his Sixth and Fourteenth right to confrontation by

27  the state trial court's prohibition of cross-examination of Brita Weber regarding her sexual

28  activities with Jennifer Koaler.

1    The Court does not reach the remaining claims and issues in the case, including the

2  confrontation claim regarding the exclusion of the videotape and further including Grounds 3

3  and 4, which pertain to the weapon enhancements on the charges.  The Confrontation Clause

4  violation regarding the limitation on cross-examination invalidates the conviction on all charges

5  together with all weapon enhancements as to those charges.[64]

6    IT THEREFORE IS ORDERED that the Petition for a Writ of Habeas Corpus is

7  conditionally GRANTED and that, accordingly, the state court judgment of conviction hereby

8  is VACATED and Petitioner shall be released from custody within thirty (30) days of the later

9  of the conclusion of any proceedings seeking appellate or *certiorari* review of the Court's

10  judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless

11  the State files a written election in this matter within the thirty day period to retry Petitioner and

12  thereafter commences jury selection in the retrial within one hundred twenty (120) days

13  following the election to retry Petitioner.

14    The Clerk of the Court shall enter final judgment accordingly in favor of Petitioner and

15  against Respondents, conditionally granting the Petition for a Writ of Habeas Corpus as

16  provided above.

17    DATED: August 7, 2008.

20  _____
   PHILIP M. PRO
21  United States District Judge

25    [64]The Court notes that the Respondents did not address in the Answer the Petitioner's confrontation

26  claim based upon the restriction on cross-examination.  Respondents addressed only the confrontation claim
   based upon the exclusion of the video. #43, at 10-11.  Judgment by default is unavailable in habeas corpus

27  proceedings, and no such judgment by default is being entered here.  However, there is no guarantee that the
   Court will reopen the pleadings, particularly in an older case, to give the Respondents a second opportunity to

28  address a claim that has been presented but not responded to by the Respondents.